NUMBER 13-09-124-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI - EDINBURG  

                                                                                                                     


 

DANIEL GONZALEZ
CASTANEDA,                                      Appellant,

 

v.

 

THE STATE OF TEXAS,                         
                             Appellee.

                                                                                                                     
  

 

On appeal from the 370th
District Court 

of Hidalgo County,
Texas.

                                                                                                                     


 

MEMORANDUM OPINION

 

Before Justices
Garza, Vela, and Perkes

Memorandum Opinion by
Justice Vela

                                                                                                                                    

            A jury convicted appellant, Daniel Gonzalez Castaneda,
of murder.  See Tex. Penal Code
Ann. § 19.02(b) (Vernon 2003).  After finding he had a previous felony
conviction, the jury assessed punishment at life imprisonment.  In three
issues, Castaneda argues the evidence is legally insufficient to support his
conviction, and he complains of charge error.  We affirm.

I. Factual Background

A. State’s Evidence

            On March 21, 2008, Pablo Magallan was driving
a friend, Victor Cavazos, to Cavazos’s Hidalgo County home when a black Ford
Expedition passed Magallan’s vehicle and cut in front of him.  Cavazos knew
that Magallan’s neighbor, Castaneda, nicknamed “Puerco”, drove such a vehicle. 
Cavazos testified that they began following the Expedition because Magallan wanted
to find out why the driver “cut him off.”  Both vehicles then parked on Melba
Carter Street in Mission, Texas (the street on which both Magallan and
Castaneda lived), and Cavazos saw Castaneda standing next to the Expedition’s
driver’s side door.  Magallan, who was not carrying any weapons, walked “[w]ith
his hands down, on his side” toward Castaneda.  Cavazos testified that “[r]ight
when he [Magallan] got about . . . six, eight feet, [from Castaneda] that’s
when I saw the shadow, the gun come out of Puerco’s hand, and I saw the sparks
come out.”  Cavazos said he “heard a gunshot. . . .  And then Pablo [Magallan]
just . . . collapsed.”

            On cross-examination, Cavazos testified he
recognized Castaneda as the shooter “because of his physical attributes.”  When
defense counsel asked him, “So did you assume that it was Daniel because of his
physical attributes, as you say?”, he said, “Yes, ma’am.”        

Officer Esteban Jara was dispatched to
Magallan’s home at 304 Melba Carter and saw Magallan lying on the ground with a
bullet wound below his rib cage.  He asked, “[W]ho shot you?”, and Magallan
said, “Daniel.”  He asked Magallan where Daniel lived, and he pointed in a
westward direction and said, “[H]e lives here.”  Officer Jara testified his
investigation revealed that Castaneda lived in the residence and occasionally
drove a black Ford Expedition.

Castaneda’s sister, Manuela Ruiz,
testified that on the evening in question, she was at Castaneda’s home and
heard a gunshot.  Afterwards, she saw that Cavazos “reached to the back [of
Magallan], [and] . . . got a gun out. . . .”  Cavazos ran with the gun toward
Magallan’s house and returned to the scene before the police arrived.

On cross-examination, Ruiz testified she
saw Magallan “trying to get something from his back.”  When defense counsel
asked her, “And was he [Magallan] walking toward where Daniel was at?”, she
said, “No.  He was walking toward the door where we were at.”  She said Cavazos
“reached to his [Magallan’s] back and got a gun.”

On re-direct-examination, when the
prosecutor asked Ruiz, “So then you got to see when your brother [Castaneda]
shot him [Magallan]?  You didn’t only hear the shot, . . . but you got to see
it?”, she said, “Yes.”  She stated that the weapon that Cavazos took from
Magallan “was a silver, like, an automatic. . . .”  She said that after the
shooting, Castaneda left in his Expedition.

Castaneda’s nephew, Rene Loredo, Jr.,
testified that after the shooting, he picked up Castaneda, who was carrying a
rifle, and took him to a motel.  A few days later, Loredo moved him to Mexico. 
Afterwards, police recovered a rifle that was found underneath a mattress in
the motel room where Castaneda had stayed.  Shortly thereafter, Mexican
authorities apprehended Castaneda and delivered him to Mission police.

While at the Mission Police Department,
Castaneda waived his Miranda[1]
rights and provided a written statement to the police in which he stated, in
relevant part, that on the evening in question, he returned home after picking
up his nephew, Leroy Espinoza.  They left Castaneda’s home in Castaneda’s black
Expedition with Espinoza driving the vehicle.  As they drove toward Bryan Road,
a Dodge passed them and hit the curb.  Castaneda told Espinoza to turn around
and go back home.  When they turned to go home, Castaneda saw the Dodge
“reversing and then came back behind us.”  When they returned home, Castaneda
ran into the house, found a rifle, and loaded it.  When he went outside,
“Pablo” kept telling him, “’Pos’ que onda?’”[2] 
He stated that Pablo “kept getting closer, but I kept telling him that he
needed to leave.  Every time I said something, he kept getting closer.  I was
not sure to shoot, but since he was getting closer, but at one point I guess I
decided to pull the trigger. . . .”  He stated that, “[w]hen I shot Pablo he
just fell to the ground. . . .  As soon as I saw him go to the ground, I ran to
the Expedition with the rifle and drove away. . . .”  He stated that, “I had
put the rifle under the mattress in the [motel] room” before leaving for
Mexico.       

During its case-in-chief, the State
introduced the rifle that was recovered from the motel room into evidence.[3] 
Loredo identified the rifle as the one that Castaneda was carrying when he took
him to the motel.

Dr. Norma Farley, the forensic
pathologist who conducted Magallan’s autopsy, testified his cause of death “was
a perforating gunshot wound to the abdomen.”  She recovered bullet fragments
from his lumbar vertebral column, and she recovered another bullet fragment
from the musculature of his lower back.  She stated that a blood specimen from
Magallan showed he was intoxicated.

B. Defense Evidence

            Leroy Espinoza testified that on the evening
in question, he was driving Castaneda’s Expedition while Castaneda sat in the
front-passenger seat.  Espinoza stated that after he passed a black truck, it
passed them “through the shoulder.  And then right when he was right next to
us, he stepped on it.  And that’s when he just went real fast, and I guess he
noticed the stop sign coming and he hit the brakes.”  Espinoza said that the
black truck went through the stop sign, hit a ramp, and “landed almost in front
of the pole.”  The black truck started to follow them, and Castaneda told
Espinoza “to go home.”  Espinoza drove to Castaneda’s home at 302 Melba Carter
and parked the vehicle.  Castaneda got out and told Magallan to leave. 
Espinoza testified he saw Magallan “[b]y the house, like probably already half
ways of the house” and walking “toward Mr. Castaneda.”  When defense counsel
asked Espinoza to describe what Magallan was doing as he approached Castaneda,
he said, “Just kept on repeating what he was saying, all mad.”  Espinoza
testified Castaneda had “a weapon,” and when defense counsel asked Espinoza to
“describe what Pablo Magallan was doing as he was coming toward . . . Mr.
Castaneda?”, he said, “Kept on just arguing.  When . . . Mr. Castaneda was telling
him, ‘chispale,’ leave, leave my house, leave my house.  The more Mr. Castaneda
was trying to back off, the more Pablo was enforcing, going his way.  And he
was going his way, reaching back, . . . .”  When defense counsel asked Espinoza
to “describe . . . how it is that he [Magallan] was reaching back?”, he said,
“He was going like that, like, Who the hell do you think you are?  But reaching
back, like reaching back.  Who do you think you are, coming like that, still
walking toward Mr. Castaneda.”  Espinoza stated that Castaneda “was moving
back.”  When defense counsel asked Espinoza, “And what happened next?”, he
said, “I just heard a fire” and Castaneda “just leaves.”

            Castaneda did not testify during the
guilt-innocence phase of the trial.

II. Discussion

A. Sufficiency Of The Evidence

            In issue one, Castaneda argues the evidence
is legally insufficient to support his conviction.

               1. Standard Of Review

               “When
conducting a legal sufficiency review, a court must ask whether ‘any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt’–not whether ‘it believes that the evidence at
trial established guilt beyond a reasonable doubt.’”  Laster v. State,
275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting Jackson v. Virginia,
443 U.S 307, 318-19 (1979)) (emphasis in original).  “In doing so, we assess
all of the evidence ‘in the light most favorable to the prosecution.’”  Id.
(quoting Jackson, 443 U.S. at 319).  “After giving proper deference to the
factfinder’s role, we will uphold the verdict unless a rational factfinder must
have had reasonable doubt as to any essential element.”  Id. at 518.  We
must presume that the factfinder resolved any conflicting inferences in favor
of the prosecution and defer to that resolution.  Jackson, 443 U.S. at
326.

               Our review of a legal sufficiency
challenge should be examined under the principles of review for a
hypothetically correct jury charge.  Grotti v. State, 273 S.W.3d 273,
280-81 (Tex. Crim. App. 2008).  “‘Such a charge [is] one that accurately sets
out the law, is authorized by the indictment, does not unnecessarily increase
the State’s burden of proof, or unnecessarily restrict the State’s theories of
liability, and adequately describes the particular offense for which the
defendant was tried.’”  Villarreal v. State, 286 S.W.3d 321, 327 (Tex.
Crim. App. 2009) (quoting Malik v. State, 953 S.W.2d 234, 240 (Tex.
Crim. App. 1997)).

               2.
Applicable Law

               A
person commits murder when he or she (1) intentionally or knowingly causes the
death of an individual or (2) intends to cause serious bodily injury and
commits an act clearly dangerous to human life that causes the death of an
individual.  Tex. Penal Code Ann.
§ 19.02(b)(1), (2).  A person acts intentionally when it is his or her
conscious desire to cause the result of his or her conduct.  Id. §
6.03(a).  A person acts knowingly when he or she is aware that his or her
conduct is reasonably certain to cause the result.  Id. § 6.03(b).  A
person’s knowledge and intent may be inferred from the “acts, words, and
conduct of the accused.”  Hart v. State, 89 S.W.3d 61, 64 (Tex. Crim.
App. 2002).  The charge instructed the jury they could convict Castaneda of
murder if they found beyond a reasonable doubt that on or about March 21, 2008,
he “intentionally or knowingly cause[d] the death of an individual, namely,
PABLO MAGALLAN, JR. AKA PABLE MAGALLAN, by shooting him with a firearm. . . .” 
(emphasis in original).  

3.
Analysis Of Sufficiency Challenge

            A rational jury could have determined the
following from the evidence:  (1) Espinoza and Magallan parked their vehicles
on Melba Carter Street; (2) Magallan and Castaneda got out of their vehicles;
(3) as Magallan approached Castaneda, Castaneda shot him and fled the scene;
(4) when Castaneda shot Magallan, Magallan fell to the ground; and (5) Magallan
died from a gunshot wound to the abdomen.  A fact finder may draw an inference
of guilt from the circumstance of flight from the crime scene.  Clayton v.
State, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007).  Furthermore,
Castaneda’s attempt to conceal his weapon by hiding it underneath a mattress in
his motel room is probative of wrongful conduct and is also a circumstance of
guilt.  See Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2007)
(stating that “[a]ttempts to conceal incriminating evidence, are probative of
wrongful conduct and are also circumstances of guilt.”).

            Controverting evidence showed that:  (1) a
firearms and tool marks examiner could not determine whether the bullet
fragments removed from Magallan’s body were fired from the rifle recovered from
the motel room where Castaneda had stayed, and (2) Cavazos could not positively
identify Castaneda as the person who shot Magallan.  However, the jury
apparently chose to believe the other evidence, such as Magallan’s dying declaration
that “Daniel” shot him, Ruiz’s testimony that she saw Castaneda shoot Magallan,
and Castaneda’s statement to the police in which he confessed to shooting
Magallan.  The jury is the exclusive judge of the facts proved and of the
weight given to the testimony.  Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979).  Therefore, the jurors
were free to accept or reject any or all of the witnesses’ testimony.  Davila
v. State, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref’d)
(citing Alvarado v. State, 818 S.W.2d 100, 105 (Tex. App.–San Antonio
1991, no pet.)); see also Lancon v. State, 253 S.W.3d 699, 705 (Tex.
Crim. App. 2008) (stating “[t]he jury is in the best position to judge the
credibility of a witness because it is present to hear the testimony, as
opposed to an appellate court who relies on the cold record.”).  We must defer
to the jury’s determination.  See Clayton, 235 S.W.3d at 778 (stating
that “[w]hen the record supports conflicting inferences, we presume that the
factfinder resolved the conflicts in favor of the prosecution and therefore
defer to that determination.”).  Viewing all the evidence in the light most
favorable to the verdict, we conclude the evidence is legally sufficient for a
rational jury to find Castaneda guilty of Magallan’s murder beyond a reasonable
doubt.

               By this same issue, Castaneda contends the
evidence is legally insufficient because after the State finished its
case-in-chief, but before it rested, it amended the indictment and did not
thereafter reintroduce all of the evidence that it had introduced prior to
amendment of the indictment.  After the State completed its case-in-chief, but
before it rested, the prosecutor requested to amend the indictment to allege
the victim’s name as “Pablo Magallan Jr. a/k/a Pablo Magallan.”[4] 
With respect to the offered amendment, defense counsel stated, “I have no
objection, Judge.”  The trial court granted the amendment, and the prosecutor
read the amended indictment in open court to the jury.  After defense counsel informed
the court that Castaneda’s plea to the amended indictment was “not guilty,” the
State then rested its case.  Even if we assume that after the State amended the
indictment, it was required to reintroduce the evidence that it had introduced
during its case-in-chief, defense counsel has waived the issue by failing to
object to the failure to reintroduce the evidence.  See Tex. R. App. P. 33.1.  We note that the
evidence showed the victim was known both as Pablo Magallan and as Pablo
Magallan, Jr.  Issue one is overruled.   

B. Lesser-Included Offense Instruction

               In issue two, Castaneda argues the trial
court erred by denying his request for an instruction on the lesser-included
offense of manslaughter.  When
evaluating charge error, we first determine whether there was error in the
charge.  Almanza v. State, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985)
(op. on reh’g); see Ngo v. State, 175 S.W.3d 738, 743 (Tex. Crim.
App. 2005).  If error exists, “the next step is to make an evidentiary review .
. . as well as a review of any other part of the record as a whole which may
illustrate the actual, not just theoretical, harm to the accused.”  Almanza,
686 S.W.2d at 174 (op. on reh’g).

               In deciding whether the trial court should
have charged the jury on a lesser-included offense, we apply a two-prong test. 
Segundo v. State, 270 S.W.3d 79, 90 (Tex. Crim. App. 2008); see Hall
v. State, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007).  First, we decide if
the offense is a lesser-included offense of the alleged offense.  Segundo,
270 S.W.3d at 90; see Salazar v. State, 284 S.W.3d 874, 875-76
(Tex. Crim. App. 2009); Hall, 225 S.W.3d 526, 535 (holding the sole test
to decide the first step of the two-prong test is the cognate-pleadings
approach, which examines the elements of the offense and the facts in the
charging instrument).  Second, we determine if some evidence exists in the
record “from which a rational jury could acquit the defendant of the greater
offense while convicting him of the lesser included offense.”  Segundo,
270 S.W.3d at 90-91.  The lesser-included offense is only an option if the
evidence establishes it as a valid, rational alternative to the charged
offense.  Id. at 91 (citing Arevalo v. State, 943 S.W.2d 887, 889
(Tex. Crim. App. 1997)).  The court of criminal appeals has held that anything
more than a scintilla of evidence can be enough to afford the defendant a
lesser-included charge.  Hall, 225 S.W.3d at 536.

               A person commits murder when he or she (1)
intentionally or knowingly causes the death of an individual or (2) intends to
cause serious bodily injury and commits an act clearly dangerous to human life
that causes the death of an individual.  Tex.
Penal Code Ann. § 19.02(b)(1), (2).  A person commits manslaughter if he
or she “recklessly causes the death of an individual.”  Id. § 19.04(a). 
“A person acts recklessly, or is reckless, with respect to . . . the result of
his conduct when he is aware of but consciously disregards a substantial and
unjustifiable risk that . . . the result will occur.”  Id. § 6.03(c).

               Under code of criminal procedure article
37.09(3), manslaughter is a lesser-included offense of murder.  Schroeder v.
State, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003); Moore v. State,
969 S.W.2d 4, 9-10 (Tex. Crim. App. 1998).  Because the law is well established
that manslaughter is a lesser-included offense of murder, the first prong is
satisfied.  Girdy v. State, 213 S.W.3d 315, 318 (Tex. Crim. App. 2006); Arnold
v. State, 234 S.W.3d 664, 671 (Tex. App.–Houston [14th Dist.] 2007, no
pet.).  The only difference between the two offenses is the required mental
state.  Arnold, 234 S.W.3d at 671. 

 

                In Mathis v. State, the defendant
shot three people, killing two and wounding the third.  67 S.W.3d 918, 921
(Tex. Crim. App. 2002).  The defendant argued to the court of criminal appeals
that the trial court erred in failing to instruct the jury on the
lesser-included offense of manslaughter in the death of the second victim
because he (the defendant) acted recklessly with the gun, and he did not intend
to kill anyone.  Id. at 925.  The court of criminal appeals concluded
the defendant “admitted to aiming and firing the gun.”  Id. at 926.  The
court stated that even though the defendant wanted a lesser-included charge,
“[a]part from [the defendant’s] own testimony that he did not intend to kill
anyone, there was no other evidence in support of such theory, and in fact the
evidence refuted that testimony.”  Id.  The court, therefore, held that
an instruction on a lesser-included charge of manslaughter was not
appropriate.  Id.

               Here, Castaneda stated in his written
statement that he ran into the house, found a rifle, loaded it, and went back
outside.  When he went outside, “Pablo” kept telling him, “’Pos’ que onda?’” 
Castaneda stated that, “I was not sure to shoot, but since he was getting
closer, but at one point I guess I decided to pull the trigger. . . .”  The
evidence in this case does not constitute evidence upon which a jury could
rationally find that Castaneda only acted recklessly with respect to killing
Magallan.  See id.  Castaneda’s statement does not supply evidence upon
which a jury could rationally find that Castaneda’s actions toward Magallan
were merely reckless and were not at least knowing.  Because there is not
sufficient evidence from which a jury could rationally acquit Castaneda of
murder while convicting him of manslaughter, the second prong of the test fails. 
Thus, we hold the trial court did not err in refusing to instruct the jury on
the lesser-included charge of manslaughter.  Issue two is overruled.

C. Self-Defense Instruction

               In issue three, Castaneda argues the trial
court erred in denying his self-defense instruction.  Castaneda requested a
jury instruction on self-defense, but the trial court denied the instruction.

               1. Standard Of Review

               A trial court must instruct the jury on
all defensive issues raised by the evidence and requested by the defendant.  Booth
v. State, 679 S.W.2d 498, 500 (Tex. Crim. App. 1984); In re E.C.I.,
278 S.W.3d 510, 521 (Tex. App.–Houston [14th Dist.] 2009, pet. denied).  “[I]f
the evidence, viewed in the light most favorable to the defendant, does not
establish self-defense, the defendant is not entitled to an instruction of the
issue.”  Ferrel v. State, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001)
(footnote omitted).

               “[A] person is justified in using force
against another in self-defense when and to the degree the actor reasonably
believes the force is immediately necessary to protect the actor against the
other’s use or attempted use of unlawful force.”  Tex. Penal Code Ann. § 9.31(a) (Vernon Supp. 2010).  A person
is justified in using deadly force against another in self-defense “[i]f the
actor would be justified in using force against the other [person] under
Section 9.31” and “when and to the degree the actor reasonably believes the
deadly force is immediately necessary to protect the actor against the other’s
use or attempted use of unlawful deadly force.”  Id. § 9.32(a)(1),
(a)(2)(A).

               “Deadly force” is defined as “force that
is intended or known by the actor to cause, or in the manner of its use or
intended use is capable of causing, death or serious bodily injury.”  Id.
§ 9.01(3).  “’Serious bodily injury’ means bodily injury that creates a
substantial risk of death or that causes death, serious permanent
disfigurement, or protracted loss or impairment of the function of any bodily
member or organ.”  Id. § 1.07(a)(46).  The term “reasonably believes” in
section 9.32 includes the concept that a defendant “is justified in defending
against danger as he reasonably apprehends it.”  Hamel v. State, 916
S.W.2d 491, 493 (Tex. Crim. App. 1996).  Thus, a defendant has the right to
defend himself from apparent danger to the same extent as he would if the
danger were real.  Id.

               2. Analysis 

               When, as in this case, the defendant “used
deadly force, there must be some evidence to satisfy the requisites of sections
9.31 and 9.32 of the Texas Penal Code.”  Guilbeau v. State, 193 S.W.3d
156, 159 (Tex. App.–Houston [1st Dist.] 2006, pet. ref’d) (citing Dyson v.
State, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984)).  Thus, “some evidence”
must exist to show the defendant “reasonably believed that use of deadly force
was immediately necessary to protect himself against a use of unlawful deadly
force by” the victim.  Id. at 159-60.  In the absence of evidence of the
victim’s use or attempted use of deadly force, the section 9.32 defense is not
available.  Id. at 160; Preston v. State, 756 S.W.2d 22, 25 (Tex.
App.–Houston [14th Dist.] 1988, pet. ref’d).

               Testimony showed that:  (1) Magallan
followed Castaneda to Melba Carter Street; (2) Magallan was “trying to get
something from his back” as he approached Castaneda; (3) Magallan was mad at
Castaneda; (4) when Castaneda told Magallan to leave, he refused to do so; and
(5) after the shooting, Cavazos took a gun from Magallan that he had behind his
back.  However, for a self-defense instruction to be required, there must be
“some evidence” to show that Castaneda reasonably believed that use of deadly
force was immediately necessary to protect himself against a use of unlawful
deadly force by Magallan.  In Castaneda’s statement to the police, he stated
that Magallan followed him and Espinoza to Melba Carter Street.   When Espinoza
parked at Castaneda’s house, Castaneda ran into his house, found a rifle,
loaded it, and went outside. Magallan kept telling Castaneda, “’Pos’ que
onda?’”  Castaneda stated that Magallan “kept getting closer, but I kept
telling him that he needed to leave.  Every time I said something he kept
getting closer.  I was not sure to shoot, but since he was getting closer, but
at one point I guess I decided to pull the trigger. . . .”  Castaneda did not
state that he either saw or believed that Magallan was reaching for a weapon,
that he knew Magallan carried a weapon on his person, or that he believed
Magallan was carrying a weapon at the time of the shooting.  Furthermore,
Castaneda did not state he believed the action he took was necessary to defend
his life.

               Viewed in the light most favorable to
Castaneda, the facts and circumstances surrounding the shooting do not constitute
some evidence that Castaneda reasonably believed deadly force was immediately
necessary to protect himself against a use or attempted use of unlawful deadly
force by Magallan.  Castaneda was not entitled to a self-defense instruction if
his use of force was in response to verbal provocation alone.  Hamel,
916 S.W.2d at 494.  We hold that the trial court did not err by denying
Castaneda’s self-defense instruction.  Issue three is overruled.

 

III. Conclusion

               We affirm the trial court’s judgment.

 

 

 

                                                                                         ROSE
VELA

                                                                                         Justice

 

Do not publish.

Tex.
R. App. P.
47.2(b).

 

Delivered and filed
the 

10th day of March,
2011.

 

 

 

 









[1]
See Miranda v. Arizona, 384 U.S. 436 (1966).

 





[2]
The English translation in the reporter’s record is, “Well, what’s up?”

 





[3]
The State introduced the rifle into evidence as State’s exhibit 56.





[4]
The original indictment alleged the victim’s name only as “Pablo Magallan.”